Adam E. Polk (SBN 273000)
Jordan Elias (SBN 228731)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
apolk@girardsharp.com
jelias@girardsharp.com

*Counsel for Plaintiff Sam Foley*

*[Additional counsel listed on signature page]*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SAM FOLEY, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| v. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| STEM, INC. f/k/a STAR PEAK ENERGY TRANSITION CORP., JOHN CARRINGTON, ERIC SCHEYER, WILLIAM BUSH, MICHAEL D. WILDS, MICHAEL C. MORGAN, ADAM E. DALEY, ALEC LITOWITZ, DESIRÉE ROGERS, and C. PARK SHAPER, | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiff Sam Foley ("Plaintiff"), by and through his undersigned counsel, alleges the following based upon the investigation of counsel, which included, among other things, the review and analysis of: (i) public filings of Stem, Inc. f/k/a Star Peak Energy Transition Corp. ("Stem" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and other public statements of Stem and other Defendants; (iii) media and news reports and other publicly available information concerning Stem and other Defendants; (iv) analyst and media reports concerning Stem; and (v) other public information concerning Stem. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.    **NATURE OF THE ACTION**

1.    This securities class action is brought on behalf of purchasers of Company common stock from December 4, 2020 to April 3, 2023 (the "Class Period"). Plaintiff asserts claims for relief against Stem and certain of the Company's current and former directors and officers ("Defendants") under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and under Sections 11 and 15 of the Securities Act of 1933 ("Securities Act").

2.    The Company originally operated as a publicly traded special purpose acquisition company ("SPAC")[1] known as Star Peak Energy Transition Corporation. On December 4, 2020, the Company announced that it had entered a merger agreement with Stem, Inc. ("Legacy Stem"). On December 17, 2020, the Company filed a registration statement for this merger on Form S-4, and on March 30, 2021, the Company filed a joint prospectus and proxy statement on Form 424B3 (the "Prospectus" and, together with the registration statement filed on December 17, 2020, the "Registration Statement"). On April 28, 2021, the Company announced that its merger with Legacy Stem (the "Merger") had been consummated, and the next day, the Company's common shares, which had previously traded under the symbol "STPK," began trading under the symbol "STEM."

---

[1] A SPAC, also known as a blank-check company, is a development stage company without a specific business plan or purpose or which has indicated that its business plan is to engage in a merger or acquisition with an unidentified company or companies, other entity, or person.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO.

3.     Stem is a provider of energy storage systems. In addition to selling hardware sourced from original equipment manufacturers ("OEMs"), the Company purports to provide its customers "on-going software-enabled services to operate the energy storage systems" through its Athena artificial intelligence platform. The Company claims it is well positioned to benefit from increasing global initiatives to make energy ecosystems more efficient and otherwise reduce emissions, as a result of its "digitally connected intelligent energy storage network."

4.     The Company and its management have made substantial efforts, through their public statements, to differentiate Stem from other energy storage providers focused primarily on reselling OEM-manufactured hardware. Stem describes its software-enabled line of services as a "high-margin" business. Hardware resale, in contrast, is a relatively low-margin business. Stem represented that recurring revenue would flow from its software platform as the Company entered "long-term services agreements with customers for approximately 10 to 20 years." The Company's management represented during the Class Period that 100% of its service revenue results from this high-margin, recurring software business.

5.     On February 24, 2022, Stem issued a press release announcing that it had entered into a strategic partnership with Available Power, LLC, a purported developer of distributed energy resources and microgrid systems for commercial and industrial real estate, with a "[v]alue of award expected to exceed $500 million across the project portfolio," an arrangement that reportedly would "provide[] Stem exclusive rights to 100 standalone energy storage projects in Texas." The size of the project, in terms of megawatt hours, was larger than all of Stem's previous energy storage projects combined. Stem attributed the partnership win to its Athena software, furthering Stem's narrative that its unique artificial intelligence-driven approach to energy storage management differentiated the Company from competitors and would yield significant growth and earnings.

6.     After the close of the market on February 24, 2022—the same day that Stem had announced its partnership with Available Power—Stem disclosed its financial results for the year ended December 31, 2021. The results were dramatically worse than the guidance that Stem had provided as recently as November 9, 2021. On this news, Stem's stock declined by over 21% on February 25, 2022.

7.     On January 5, 2023, during premarket hours, the Company announced that its 2022

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO.

"bookings backlog" was "partially offset by [a] Stem-initiated contract cancellation (~$130M) due to partner non-performance on [an] agreed timeline." The partner subject to this cancellation was Available Power—Stem's supposed flagship customer. Stem's stock price promptly declined by over 7%.

8.     On January 11, 2023, Blue Orca Capital ("Blue Orca") issued a report alleging various undisclosed issues with Stem's business and financial prospects, including, *inter alia*, that the Company's management had misleadingly claimed that all of its services revenue was attributable to its software. According to the report, the Company's "software revenues are a tiny fraction of reported." Blue Orca further asserted that Stem's stock was trading at high multiples of forecast revenue based on the false representation that its service revenue came entirely from its high-margin software offerings. Blue Orca also reported that Stem itself had financed Available Power's Texas project and that such funding—rather than any supposedly unique software-enabled services of Stem—was what had led Available Power to partner with Stem. That funding had not been previously disclosed.

9.     On January 12, 2023, in response to the Blue Orca report, Stem published a statement that neither directly addressed nor refuted many of Blue Orca's central allegations, including that management had failed to disclose that Stem was financing Available Power and had falsely represented that 100% of Stem's service line revenue was derived from its software-enabled services.

10.     On February 16, 2023, after the close of the market, Stem reported disappointing financial results for the fourth quarter of 2022. Among other items, the Company reported quarterly revenue of $156 million—lower than consensus estimates of $166 million. On this news, Stem stock declined by over 14% on February 17, 2023.

11.     Then on April 3, 2023, Bank of America downgraded Stem's stock from "neutral" to "underperform." *Seeking Alpha* published a report on April 4, 2023 summarizing Bank of America's analysis: "Stem pitches itself as a software focused way to play energy storage, but [according to Bank of America,] 'slow realization of revenues from this business means the company is ultimately dependent on lower margin hardware and service businesses . . . .'" On this news, Stem stock declined by over 7% on April 4, 2023.

12.     As of the filing of this Complaint, Stem's common stock was trading significantly below

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO.

its closing price immediately prior to the Company's announcement of the Merger. As a result of Defendants' wrongful acts and omissions detailed herein, and the decline in the market value of Company stock, Plaintiff and other Class members have suffered significant losses and damages.

## II.  JURISDICTION AND VENUE

13.  The claims asserted herein arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, § 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. §§ 1331 and 1337.

14.  Venue is properly laid in this District pursuant to § 22 of the Securities Act, § 27 of the Exchange Act, and 28 U.S.C. §§ 1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District; Stem maintains its principal place of business in this District.

15.  In connection with the wrongful acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

16.  Pursuant to Civil Local Rule 3-2(c), a substantial part of the events giving rise to the claims brought herein occurred in San Francisco County, California. Consequently, assignment of this action to the San Francisco Division is appropriate.

## III.  PARTIES

17.  Plaintiff Sam Foley purchased or otherwise acquired Company securities pursuant and traceable to the Registration Statement and during the Class Period, and suffered damages as a result of the securities law violations set forth in this Complaint. Plaintiff appends herewith the Certification required under the Private Securities Litigation Reform Act of 1995.

18.  Defendant Stem is a Delaware corporation with its principal executive offices located in San Francisco, California. Stem's common stock and warrants trade in an efficient market on the New York Stock Exchange under the ticker symbols "STEM" and "STEM.WS," respectively. Prior to the Merger, the Company was a Delaware corporation with its principal executive offices located in Evanston, Illinois, and the Company's Class A common stock, warrants, and units traded in an efficient

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO.

market on the New York Stock Exchange under the ticker symbols "STPK," "STPK.WS," and "STPK.U," respectively.

19.   Defendant John Carrington has been the Company's chief executive officer at all relevant times since the Merger closed. Carrington also currently is a director of the Company. During the Class Period, Carrington sold 538,097 Stem shares for total proceeds of approximately $8.08 million.

20.   Defendant William Bush has been the Company's chief financial officer at all relevant times since the Merger closed. During the Class Period, Bush sold 189,421 Stem shares for total proceeds of approximately $2.99 million.

21.   Defendant Eric Scheyer was the Company's chief executive officer at all relevant times before the Merger closed. Scheyer signed or authorized the signing of the Registration Statement filed with the SEC.

22.   Defendant Michael D. Wilds was the Company's chief financial officer at all relevant times before the Merger closed. Wilds signed or authorized the signing of the Registration Statement filed with the SEC.

23.   Defendant Michael C. Morgan was the Company's chairman of the board at all relevant times before the Merger closed. Additionally, Morgan has been a director of the Company at all relevant times since the Merger closed. Morgan signed or authorized the signing of the Registration Statement filed with the SEC.

24.   Defendant Adam E. Daley has been a director of the Company at all relevant times. Daley signed or authorized the signing of the Registration Statement filed with the SEC. During the Class Period, Daley sold 500,000 Stem shares for total proceeds of approximately $8.37 million.

25.   Defendant Alec Litowitz was a director of the Company at all relevant times before the Merger closed. Litowitz signed or authorized the signing of the Registration Statement filed with the SEC.

26.   Defendant Desirée Rogers was a director of the Company at all relevant times before the Merger closed. Rogers signed or authorized the signing of the Registration Statement filed with the SEC.

27.   Defendant C. Park Shaper was a director of the Company at all relevant times before the

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO.

Merger closed. Shaper signed or authorized the signing of the Registration Statement filed with the SEC.

28.   "Individual Defendants," as used in this Complaint, refers to Carrington, Bush, Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper; "Securities Act Individual Defendants" refers to Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper.

29.   The Individual Defendants had the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that affirmative representations being made were materially false and misleading at the time they were made. The Individual Defendants are liable for the false statements and omissions pleaded herein.

30.   As directors and executive officers of the Company, each of whom signed the Registration Statement, the Securities Act Individual Defendants participated in the solicitation of the Company's securities in the Merger.

IV.   **FACTS**

    **A.   Background**

31.   Stem, a provider of energy storage systems, sells hardware sourced from OEMs. Stem also purports to provide its customers software-enabled services to operate this hardware using its Athena artificial intelligence platform.

32.   The Company operated as a SPAC until April 28, 2021.

33.   On December 4, 2020, the Company announced that it had entered into a definitive agreement for the Merger with Legacy Stem that would result in a combined company with an estimated equity value of approximately $1.35 billion.

34.   On December 17, 2020, the Company filed a registration statement on Form S-4 with the SEC in connection with the Merger, which, after several amendments, was declared effective by the

6

SEC on March 29, 2021.

35.    On March 30, 2021, the Company filed the Prospectus on Form 424B3 with the SEC in connection with the Merger; the Prospectus incorporated and formed part of the Registration Statement.

36.    On April 28, 2021, the Company consummated the Merger whereby, among other things, STPK Merger Sub Corporation, a wholly-owned subsidiary of the Company, merged with and into Legacy Stem, a private Delaware corporation, with Legacy Stem surviving the transaction as a wholly-owned subsidiary of the Company. At this time, the Company renamed itself "Stem, Inc." and began operating Legacy Stem's business.

37.    On April 29, 2021, the common stock of the merged Company began trading on the New York Stock Exchange under the symbol "STEM," and the Company's warrants began trading under the symbol "STEM.WS."

**B.    The Registration Statement's False and Misleading Representations**

38.    Many statements in the Registration Statement presented Legacy Stem as an attractive merger target.  In addition to disclosing that Stem provides its customers with energy storage systems sourced from leading OEMs, the Registration Statement disclosed that Stem enters into long-term agreements to provide "software-enabled services to operate the energy storage systems . . . utilizing the Athena platform":

> Stem (i) provides its customers, which include commercial and industrial enterprises as well as independent power producers, renewable project developers, utilities and grid operators, with an energy storage system, sourced from leading, global battery original equipment manufacturers, that it delivers through its partners, including solar project developers and engineering, procurement and construction firms and (ii) Stem provides its customers, through its Athena artificial intelligence platform ("Athena"), **with on-going software-enabled services to operate the energy storage systems for 10 to 20 years**. In addition, in all the markets where Stem operates its customers' systems, Stem has agreements to manage the energy storage systems utilizing the Athena platform to participate in energy markets and to share the revenue from such market participation. (Emphasis added.)

39.    The Registration Statement also said the Company was well positioned to benefit from "the increasing global initiatives to improve the efficiency of our energy ecosystems and reduce emissions" as a result of a "digitally connected intelligent energy storage network":

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO.

Based on its due diligence investigations of Stem and the industry in which it operates, including the financial and other information provided by Stem in the course of their negotiations in connection with the merger agreement, [the Company] believes that Stem aligns well with the objectives laid out in its investment thesis which focused on identifying a business that is a market leader in, and/or benefitting from the increasing global initiatives to improve the efficiency of our energy ecosystems and reduce emissions. Consistent with [the Company's] objectives, Stem's mission to provide a critical component of the global transition to renewable energy by means of its digitally connected intelligent energy storage network for its customers. As a result, [the Company] believes that a merger with Stem will provide [the Company's] stockholders with an opportunity to participate in the ownership of a publicly-listed company with significant growth potential at an attractive valuation.

40.    The Registration Statement further described that Legacy Stem "ha[s] numerous partnerships with a diverse set of industry leaders to reduce execution risk and increase speed to market in certain geographies"; and that Legacy Stem, "[i]nternationally, . . . ha[s] partnered with leading regional industrial equipment and energy firms . . . each focused on leveraging the partner's local market knowledge and reputation with leading corporates, utilities and grid operators."

41.    The Registration Statement also said that the Company "intend[ed] to leverage our competitive strengths, technology leadership and market share position to build out the largest, digitally connected, AI-powered energy storage network, through" several strategies, including a "Continued Focus on Software Innovations," "Front-of-the-Meter Expansion," "International Market Growth," "More Favorable Supply Chain and Financing Terms," and "Additional Service Offerings." The Registration Statement added that "[w]e have significant in-house expertise in large utility scale projects and have developed a strategy to expand our team and technical capabilities for larger FTM [Front-of-the-Meter] opportunities"; that "[w]e have a history of innovation in the energy storage market through our development of an AI-powered storage technology and zero-money down financing"; that Legacy Stem "ha[s] built a sizeable leadership position"; and that "[w]e have additional end-market opportunities in other applications for storage such as electric vehicle charging ('EV') integration and power solutions."

42.    With respect to competition, the Registration Statement asserted, *inter alia*, that "industry transformation has created an opportunity for an increased role for energy storage solutions like ours" and "[w]e believe as one of the largest in this industry we have a significant head start against our

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO.

competition in this rapidly evolving environment."

43.    Likewise, the Registration Statement asserted that Legacy Stem's "industry peers are typically focused on the development and marketing of single-purpose built solutions with captive hardware offerings, while our AI-powered platform is capable of delivering a multitude of software-enabled services operating an extensive and diverse network of energy storage systems across multiple geographies, utility and grid operator service areas."

44.    In further regard to Legacy Stem's and, accordingly, the Company's post-Merger competitive advantages, the Registration Statement stated, in relevant part:

> We believe that one of the key advantages driving sustainable differentiation for our company includes the focus and capabilities built in our pioneering history in the BTM [Behind-the-Meter] segment of the energy storage industry. This experience required an emphasis on AI-driven co-optimization of energy storage operations and the build out of significant operational infrastructure to execute economic considerations for enterprise customers, utilities and grid operators. We believe that the distributed asset management capability from this experience positions us well to compete in the evolving FTM segment of the energy storage industry as recent regulatory actions include the liberalization and formalization of rules for compensation of market participation for distributed energy resources. We believe the legacy single-purpose market for FTM solutions will be driven by greater demand for flexible solutions that can access multiple market opportunities. Our solutions have been designed to mitigate the challenges of today's enterprise customers, independent power producers, utilities, renewable asset owners and the modern electrical grid at scale with continuous improvements to artificial intelligence optimization strategies informed by operational data from one of the industry's largest network of digitally-connected energy storage systems. We believe we are well-positioned to compete successfully in the market for energy storage hardware and software-enabled services. Despite our limited operating history, we are among the leaders in global distributed energy storage under management, supported by our Athena platform, compelling customer services, strategic partnerships and seasoned leadership team with a proven track record of success.

45.    The Registration Statement gave the misleading impression that Stem's long-term agreements to provide AI-driven services to its customers would result in a substantial, recurring revenue stream, providing significant growth and earnings, and that its unique AI-driven approach to energy storage management differentiated it from competitors. In fact, Stem had materially overstated its prospects for capitalizing on its AI platform.

**C.     Other False and Misleading Representations During the Class Period**

46.     On December 4, 2020, the Company hosted a conference call with investors and analysts to discuss the Company's merger with Legacy Stem. During this call, Defendant Carrington described that Stem's business was "really about the software," and that its "Athena software creates the super intelligence that drives these large lithium-ion batteries."

**[Analyst]**

So, you are creating what would be the first public pure play smart energy storage company. What does that mean?

**[Defendant Carrington]**

Yeah. So, we provide clean energy battery solutions that allow our customers to reduce energy costs, reduce carbon emissions, and provide greater reliability for the grid. **All of that is operated by our proprietary AI-driven software platform we call Athena. So, it's really about the software**, and we like to think of it as, the Athena software creates the super intelligence that drives these large lithium-ion batteries. (Emphasis added.)

47.     On November 9, 2021, Stem hosted a conference call with investors and analysts to discuss the Company's third quarter 2021 financial results. During this call, Defendant Bush represented that the Company's services revenue consisted entirely of software-related revenue:

**[Analyst]**

First, a little bookkeeping question. But on the service revenue line, is that 100% software-related revenue? Or is there another component to that?

**[Defendant Bush]**

That is 100% software revenue.

48.     On November 9, 2021, in a press release for its financial results for the third quarter of 2021, the Company reaffirmed its 2021 revenue and gross profit guidance:

The Company reaffirms its guidance of full-year 2021 revenue of $147 million and full-year 2021 Adjusted EBITDA of $(25) million. Consistent with prior guidance, the Company reaffirms that it expects to recognize 50-60% of total 2021 revenue in Q4. The Company expects to provide 2022 guidance in its fourth quarter/full year 2021 earnings call in mid-to-late February 2022.

49.    On February 24, 2022, Stem announced a significant new deal. Its press release entitled "Stem's Athena® Software Selected by Advanced Power to Optimize Up to 2GWh Energy Storage Portfolio in ERCOT" disclosed that the Company "has been selected to provide smart energy storage solutions in Texas to Advanced Power, a developer that designs, develops, and deploys 27 distributed energy resources and microgrid systems for commercial and industrial real estate." The press release touted this Advanced Power partnership as a major win for the Company's business, stating, in relevant part:

> This strategic partnership gives Stem exclusive rights to provide its proprietary Athena® smart energy storage software to energy storage systems at 100 front-of- the-meter (FTM) sites throughout the state of Texas. The project portfolio is expected to have a value of more than $500 million and will be completed in phases, beginning with deployment of the first 20 systems by early 2023. Together, Stem and [Advanced Power] will be providing the state grid, operating under the Electric Reliability Council of Texas (ERCOT), with an additional one gigawatt (GW), or two gigawatt-hours (GWh), of flexible electric power for 20 years. ERCOT is responsible for delivering 90 percent of the state's electric power to more than 25 million people throughout Texas. The market for energy storage in ERCOT is expected to grow more than 10 GWh over the next five years as renewable energy adoption increases and the state prioritizes grid resilience. Advanced Power will be facilitating the entire scope of work on the projects, from development of the energy storage sites, to marketing and selling the assets as they reach operation. Stem will provide the battery storage hardware at each site, incorporate Athena Bidder$^{TM}$ to optimize the bidding and dispatch of the systems (based on real-time market dynamics), and organize the portfolio of energy storage sites into a single, integrated energy intelligence platform. The full scope of Stem's software and services also includes revenue modeling, battery hardware consulting, and development support to successfully complete these projects.

50.    The press release also quoted Defendant Carrington to the effect that "[t]his partnership with Advanced Power showcases Stem's ability to support developers across the project lifecycle and enable best-in-class management of large portfolios of energy storage projects," and that "[o]ur market-leading Athena® software, advanced Bidder$^{TM}$ application, system operating knowledge, and ability to rapidly deploy projects will help Advanced Power quickly go to market and generate exceptional value."

51.    Stem's representations concerning the Advanced Power partnership were reiterated in its press release announcing its financial results for the fourth quarter of 2021:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO.

On February 24, 2022, the Company announced that it had been exclusively selected to provide storage solutions to Advanced Power, a developer of distributed energy resources. The strategic partnership will develop up to 100 FTM sites in Texas with potential to provide one gigawatt (GW), or two GWhs, of energy storage systems and Athena software. The portfolio will be completed in phases, with deployment of the first 20 systems by early 2023.

52.    On February 28, 2022, Stem filed its annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 10-K"). That filing contained statements regarding the Company's business and financial prospects, including its purported competitive advantages and leadership in global distributed energy storage under management. With respect to Stem's service revenue line, including the sales comprising that revenue line, the 2021 10-K stated, in relevant part:

We generate service revenue and hardware revenue. Service revenue is generated through arrangements with host customers to provide energy optimization services using our proprietary cloud-based software platform coupled with a dedicated energy storage system owned and controlled by us throughout the term of the contract. Fees charged to customers for energy optimization services generally consist of recurring fixed monthly payments throughout the term of the contract and in some arrangements, an installation and/or upfront fee component. We may also receive incentives from utility companies in relation to the sale of our services We separately generate services revenue through partnership arrangements by providing energy optimization services after the developer completes the installation of the project.

53.    The 2021 10-K also reported that "[s]ervices revenue increased by $4.8 million primarily due to continued growth in host customers arrangements and partnership revenue related to services provided."

54.    Defendants materially misrepresented the Company's business and overstated its financial prospects. Specifically, the statement that 100% of Stem's services revenue was entirely derived from software was false. Defendants also omitted to disclose, in connection with their representations concerning the Advanced Power partnership, that Stem was providing financing to Advanced Power.

55.    It would have been material to any reasonable investor that Stem's services revenue was not wholly derived from high-margin, recurring software sales, but included revenue from its lower-margin businesses. In addition, it would have been material to any reasonable investor that Stem secured its partnership with Advanced Power by agreeing to finance it.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO.

56.    At the time of Defendant Bush's representation in the November 9, 2021 earnings call, Bush and other Defendants were aware that the Company's service revenues were not wholly derived from software sales. In addition, at the time the Company announced the Advanced Power partnership, Defendants knew that the Company had agreed to finance it.

**D.    The Truth About Stem's Business Emerges**

57.    On February 24, 2022, after the close of trading, Stem issued a press release announcing its financial results for the fourth quarter of 2021 and for the year ended December 31, 2021. Among other items, Stem reported revenue of $127.37 million for 2021, missing its revenue guidance, as reported by Stem as recently as November 9, 2021, by approximately $20 million.

58.    On this news, Stem's stock price fell $2.43 per share, or 21.62%, to close at $8.81 per share on February 25, 2022.

59.    On January 5, 2023, during pre-market hours, Stem released an investor presentation deck that it had prepared for the Goldman Sachs Global Energy and Clean Technology Conference, disclosing that its 2022 bookings backlog was "partially offset by [a] Stem-initiated contract cancellation (~$130M) due to partner non-performance on [an] agreed timeline."

60.    The customer with which Stem cancelled the contract was Available Power—the Company's purported flagship customer.

61.    Following the Company's release of the presentation deck, Stem's stock price fell $0.75 per share, or 8.78%, to close at $7.79 per share on January 5, 2023.

62.    On January 11, 2023, Blue Orca issued a report setting out various additional undisclosed issues relating to Stem's business and financial prospects, including, *inter alia*, that the Company had overstated its software revenues by falsely claiming that 100% of its services revenue line was attributable to software revenue:

> STEM's stock trades at a premium on its claim that its low-margin hardware sales are accompanied by high-margin software revenues from its Athena AI platform, which STEM claims has a growing pipeline of recurring future revenues. . . . STEM claimed to generate $20.5 million in FY 2021 from "services revenue." STEM's management stated unequivocally that "100%" of this services revenue line was from "software revenue." **In our view, this is a lie.** Rather, almost all of this services revenue is not from software, but from a legacy business under which STEM leases hardware to customers in what it calls "host customer arrangements." These arrangements, which

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO.

STEM are [sic] winding down, are akin to hardware leases with a small software and services component, yet STEM tries to claim that 100% of the revenues from these contracts are software. Incredibly, STEM does not even own the majority of the systems being leased. 87% of the systems are owned by unconsolidated special purpose vehicles, yet STEM uses an accounting gimmick to claim their revenue as its own. By disguising these low-margin, no growth contract leases as software revenues, we think STEM fools investors into believing that STEM has a meaningful software business in order to garner a substantially higher valuation multiple. . . . [W]e think that STEM's actual recurring software revenues are 99% less than the $20.5 million in purported software revenues claimed by STEM. (Emphasis in original.)

63.    Blue Orca also alleged that Stem was surreptitiously providing capital to Available Power, and that Available Power was using these proceeds to make purchases from Stem:

**Undisclosed to Investors, STEM Finances Flagship Customer.** In February 2022, at the same time STEM announced a substantial earnings miss, it announced the signing of a flagship $500 million deal with Available Power, a new customer, for up to 1GW/2GWh of energy storage in Texas. Characterized by sell-side analysts as a "great win," the Available Power deal was so big that it was larger than STEM's total energy storage AUM at the time. The deal was supposedly an endorsement of STEM's software platform and evidence that STEM could compete for large utility-scale front-of-the-meter projects. Yet undisclosed to investors, interviews with a former STEM executive and solar industry experts revealed that STEM I contributing development capital to Available Power to finance the deal. The deal is just beginning, so the accounting details are murky, but we question whether STEM will use this arrangement to recognize revenues, profits and cash flows effectively paid for by STEM. Yet the larger point is that investors would have thought much differently about the flagship deal if they had known STEM is surreptitiously funding purchases from STEM. Rather than evidence that STEM can compete for utility-scale projects, we think this shows clearly that STEM cannot win big deals it doesn't pay for.

64.    On January 12, 2023, Stem responded to Blue Orca's report in a statement that failed to address several of the allegations, including the allegation that Stem was itself providing capital to finance Available Power's purchases from Stem:

**Software Revenues.** Our Host Customer agreements represented approximately $20 million of our total Services revenue in full-year 2021. These agreements represent ongoing software services where we optimize energy storage systems on behalf of our customers. These contracts are financed by third parties and are not classified as leases. Rather, these contracts are classified as services revenue in accordance with FASB ASU 2014-09 Topic 606, *Revenue from Contracts with Customers ("ASC 606")*.

We generated $36 million of services revenue through third quarter 2022, a 141%

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO.

increase versus the nine months ended September 30, 2021, and our services revenue in third quarter 2022 grew 9% sequentially versus the second quarter of 2022.

We believe Contracted Annual Recurring Revenue (CARR) is a good proxy for the long-term value of the differentiated technology that we provide our customers. All additions to CARR represent contracted, high-margin software services. As previously disclosed, CARR was $61 million at the end of the third quarter 2022.

Stem did not directly address Blue Orca's allegation that Defendant Bush's November 2021 statement that 100% of Stem's services revenue was software revenue was "a lie."

65.    On April 3, 2023, Bank of America downgraded Stem's stock from "neutral" to "underperform," and reduced its target for Stem's price from a $9 per share to $5 per share. The following day, *Seeking Alpha* summarized Bank of America's report:

Stem pitches itself as a software focused way to play energy storage, but "slow realization of revenues from this business means the company is ultimately dependent on lower margin hardware and service businesses to drive an EBITDA inflection," B of A's [analyst] wrote.

While company management suggests a rapid scale up in services would bridge the drop in hardware sales, "the pivot towards standing up a novel services business to hit contemplated guide accentuates the uncertainty from the latest capital raise," according to [Bank of America's analyst].

66.    On this news, Stem's stock price declined by over 7.4% on April 4, 2023, falling from $0.44 per share from its close of $5.91 on April 3, 2023 to its close of $5.47 on April 4, 2023.

67.    As of the filing of this Complaint, Stem's common stock was trading significantly below the closing price immediately before the Company's announcement of the Merger. Plaintiff and other Class members have suffered significant losses and damages as a result of Defendants' material misrepresentations and omissions.

## V.    LOSS CAUSATION

68.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive investors. Defendants' misconduct artificially inflated the price of Stem stock and deceived the Class (defined below).

69.    When Defendants' prior misrepresentations and fraudulent statements and omissions were revealed to the market—including on February 24, 2022, January 5, 2023, February 16, 2023, and April

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO.

3, 2023—the price of Stem stock sharply fell. As a result of their purchases of Stem stock during the Class Period, Plaintiff and other members of the Class suffered losses and associated damages under the federal securities laws.

## VI.    CLASS ACTION ALLEGATIONS

70.    Plaintiff brings this action as a class action on behalf of a Class of all persons who acquired Stem securities pursuant and/or traceable to the Registration Statement, and all persons who purchased Stem securities during the Class Period; and were damaged thereby. Excluded from the Class are Defendants and their immediate family members, heirs, successors, assigns, and legal representatives; any entity in which Defendants have or had a controlling interest; the officers, directors and affiliates of Defendants; and all judicial officers assigned to this matter and the members of their staff.

71.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, it can be ascertained through appropriate discovery. Plaintiff believes the Class includes at least hundreds of members. The Class members may be identified from records maintained by Stem or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

72.    Plaintiff's claims are typical of the claims of the members of the Class, as Plaintiff and all Class members have been similarly affected by Defendants' wrongful conduct in violation of federal law described herein.

73.    Plaintiff will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class and securities litigation.

74.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the Securities Act and/or the Exchange Act;

(b)    whether statements made by Defendants to the investing public in the Registration Statement, and/or in other communications during the Class Period, misrepresented or omitted material facts about the business, operations and management of Stem;

(c)    whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein;

(d)    whether the Individual Defendants caused Stem to issue false and misleading financial statements during the Class Period;

(e)    whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(f)    whether the prices of Stem securities during the Class Period were artificially inflated because of Defendants' conduct at issue; and

(g)    to what extent the members of the Class have sustained damages and the proper measure of damages.

75.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable, and the expense and burden of individual litigation would prevent members of the Class from individually redressing the wrongs done to them. A class action will provide economies of scale and supervision by a single court.

76.    Plaintiff will rely, in part, on the fraud-on-the-market presumption of reliance with respect to Defendants' material misrepresentations and omissions. The market for the Company's common stock was efficient at all relevant times, including because:

(a)    the Company's common stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient securities trading market;

(b)    the Company's common stock traded at moderate to high weekly volumes;

(c)    as a regulated issuer, the Company filed periodic reports with the SEC;

(d)    the misrepresentations and omissions set forth herein would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(e)    the Company was eligible to and did file registration statements with the SEC on Forms S-1, S-3 and S-4;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO.

(f)    the Company regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(g)    securities analysts employed by major brokerage firms followed and reported on the Company; and

(h)    there was a cause-and-effect relationship between unexpected corporate events, financial releases, and other disclosures, on the one hand, and movements in the Company's stock price, on the other.

77.    Based on the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market. Alternatively, they are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### Violation of § 10(b) of the Securities Exchange Act and Rule 10b-5
### (Against All Defendants)

78.    Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

79.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase the Company's common stock at artificially inflated prices.

80.    Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for the Company's common stock in violation of § 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

18

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO.

81.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

82.    During the Class Period, Defendants made the false statements specified above, which they knew, or were deliberately reckless in not knowing, were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

83.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or were deliberately reckless in not knowing the true facts that were available to them. Defendants engaged in this misconduct to conceal the Company's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

84.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for the Company's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

85.    By reason of the foregoing, Defendants violated § 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

86.    As a direct and proximate result of Defendants' wrongful conduct violative of § 10(b) of the Exchange Act and Rule 10b-5, Plaintiff and the other Class members suffered damages in connection with their purchases of the Company's common stock during the Class Period.

<u>**COUNT II**</u>
**Violation of § 20(a) of the Securities Exchange Act**
**(Against the Individual Defendants)**

87.    Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

88.    The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act, as alleged herein.

89.    By reason of their positions of control and authority as executive officers and directors of the Company, the Individual Defendants had the authority to influence and control, and did influence and control, the decision-making and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. The Individual Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by the Company during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein. Therefore, in their capacities as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act, the Individual Defendants participated in the unlawful conduct that artificially inflated the market price of Stem securities.

90.    As set forth above, the Company violated § 10(b) of the Exchange Act by its acts and omissions alleged in this Complaint.

91.    By virtue of their positions as controlling persons of the Company and as a result of their own aforementioned conduct, the Individual Defendants are liable under § 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiff and the other members of the Class.

92.    As a direct and proximate result of the Individual Defendants' conduct, Plaintiff and the other Class members suffered damages in connection with their purchase or acquisition of the Company's common stock.

**COUNT III**
**Violation of § 11 of the Securities Act**
**(Against Stem and the Securities Act Individual Defendants)**

93.    Plaintiff repeats and realleges each and every allegation set forth above, except allegations of fraud, recklessness, and intentional misconduct.

94.    This Count is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class against Stem and the Securities Act Individual Defendants.

95.    As set forth above, the Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO.

96.    Defendant Stem is the issuer of the shares issued and sold pursuant to the Registration Statement. As the issuer, Stem is strictly liable to Plaintiff and the Class under § 11 for the material misrepresentations and omissions in the Registration Statement.

97.    The Securities Individual Defendants each signed or were named as directors and/or officers in the Registration Statement. As such, each is strictly liable for the material misrepresentations and omissions contained in the Registration Statement. Each Securities Act Individual Defendant had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement and ensure that they were true and accurate, that there were no omissions of material facts that would render the Registration Statement misleading, and that the document contained all facts required to be stated therein. In the exercise of reasonable care, the Securities Act Individual Defendants should have known of the material misrepresentations and omissions contained in the Registration Statement and should have known of the omissions of material facts necessary to make the statements made therein not misleading or otherwise required to be stated therein. The Securities Act Individual Defendants are therefore liable to Plaintiff and the Class under Section 11 for the material misrepresentations and omissions in the Registration Statement.

98.    None of the Securities Act Individual Defendants made a reasonable investigation or had reasonable grounds for the belief that the relevant statements in the Registration Statement were true, without omission of material facts, and not misleading.

99.    By reason of the conduct herein alleged, Stem and each Securities Act Individual Defendant violated, and/or controlled a person who violated, § 11 of the Securities Act.

100.    Plaintiff acquired Stem shares pursuant and/or traceable to the Registration Statement.

101.    Plaintiff and the Class have sustained damages under § 11. The value of Stem securities has substantially declined as a result of Defendants' violations.

102.    At the time of their purchase of Stem securities, Plaintiff and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action. Less than three years

has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff commenced this action.

103. By reason of the foregoing, Plaintiff and Class members are entitled to their damages under § 11, as measured by the provisions of § 11(e), as well as any and all remedies that may exist at law or in equity.

## COUNT IV
### Violation of § 15 of the Securities Act
### (Against Stem and the Securities Act Individual Defendants)

104. Plaintiff repeats and realleges each and every allegation set forth above, except allegations of fraud, recklessness, and intentional misconduct.

105. This Count is brought pursuant to § 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class against Stem and the Securities Act Individual Defendants.

106. All of the Securities Act Individual Defendants were control persons of Stem by virtue of their positions as directors and/or executive officers of Stem. Each Securities Act Individual Defendant had a series of direct and/or indirect relationships with other directors, officers and/or major shareholders of Stem. In consequence, the Securities Act Individual Defendants had the power and influence and exercised the same to cause Stem to engage in the deceptive acts and omissions described herein.

107. Stem and each Securities Act Individual Defendant was a culpable participant in the violations of § 11 of the Securities Act set out in the preceding Count. Each signed or authorized the signing of the Registration Statement and otherwise participated in the process which allowed the Offering to proceed.

108. Plaintiff and Class members are accordingly entitled to damages for Stem's and the Securities Act Individual Defendants' violations of § 15.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating the Plaintiff as Lead Plaintiff and as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and Plaintiff's counsel as Lead Counsel;

1             B.      Awarding compensatory damages to Plaintiff and the other Class members

2 against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

3 wrongdoing, in an amount to be proven at trial, including interest thereon;

4             C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

5 this action, including counsel fees and expert fees;

6             D.      Awarding rescission or a rescissory measure of damages; and

7             E.      Such equitable, injunctive or other relief as deemed appropriate by the Court.

8 **JURY DEMAND**

9     Plaintiff hereby demands a trial by jury.

10

11 Dated: July 10, 2023                   /s/ *Adam E. Polk*

12                                 Adam E. Polk (SBN 273000)
Jordan Elias (SBN 228731)

13                                 **GIRARD SHARP LLP**

14                                 601 California Street, Suite 1400
San Francisco, CA 94108

15                                 Tel: (415) 981-4800
apolk@girardsharp.com

16                                 jelias@girardsharp.com

17                                 Paul D. Malmfeldt (*pro hac vice* application forthcoming)

18                                 **MALMFELDT LAW GROUP P.C.**

19                                 120 N. LaSalle Street, Suite 2000
Chicago, IL 60602

20                                 Tel: (312) 606-8625
pdm@malmfeldt.com

21                                 Brian J. Schall (SBN 290685)

22                                 **THE SCHALL LAW FIRM**

23                                 2049 Century Park East, Suite 2460
Los Angeles, CA 90067

24                                 Tel: (310) 301-3335
brian@schallfirm.com

25

26                                 *Counsel for Plaintiff Sam Foley*

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO.